## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CODY WRIGHT, | : | |
| | : | |
| Plaintiff | : | CIVIL NO. 1:15-CV-2418 |
| | : | |
| vs. | : | |
| | : | |
| SUPERINTENDENT VINCENT | : | (Judge Rambo) |
| F. MOONEY, et al., | : | |
| | : | |
| Defendants | : | |

### MEMORANDUM

### Background

On December 16, 2015, Plaintiff Cody Wright, an inmate presently confined at the State Correctional Institution at Forest, Marienville, Pennsylvania, filed a pro se civil rights complaint pursuant to 42 U.S.C. § 1983 against the following four individuals employed at the State Correctional Institution at Coal Township, Pennsylvania ("SCI-Coal Township"): (1) Vincent F. Mooney, Superintendent; (2) Anthony Luscavage, Deputy Superintendent; (3) Mr. Ritchie, who is alleged to be a Counselor or Unit Manager; and (4) Correctional Officer Weisenberger. (Doc. 1.)  Wright claims that the Defendants violated his rights under the Eighth Amendment to the United States Constitution when he was

provided with contaminated food and denied adequate medical care. (<u>Id.</u> at 8-9.)

In support of the Eighth Amendment claim, Wright avers that on August 8, 2015, at about 4:23 p.m., while confined at SCI-Coal Township, he was eating his dinner meal and bit into and partially swallowed the severed head of a frog. (<u>Id.</u> at 4.)  Wright claims the putrid taste made him spit out the rest of the frog head and he then immediately ran to the toilet in his cell and vomited. (<u>Id.</u>)  Wright avers that his "mouth had a tingling sensation and his throat tightened restricting his breathing" and he repeatedly pressed the medical emergency call button in his cell. (<u>Id.</u>)  After four minutes two correctional officers who are not named in the complaint as defendants appeared at his cell door. <u>Id.</u>  These two correctional officers asked Wright as well as other inmates on the cell block if they wanted to "trade their tray[s] in for [] new one[s]." (<u>Id.</u>)  Wright responded in the negative but that he wanted "pictures" and "video footage" of the frog head taken.[1]

_____

1.  It is odd that Wright, who claims that he was in a

(continued...)

(Id.) At about 5:08 p.m. Wright alleged that a Lieutenant Drucas, who is not named as a defendant, took "a picture of the severed head on [his] tray and the frog parts on the 7 other inmates['] tray[s] with a video camcorder." (Id. at 5.)  Wright alleges that he told Lieutenant Drucas that "he needed medical aid and wanted to talk with the psychology staff because his throat was tightening restricting his breathing, his mouth was tingling, he was nauseous and traumatic" and that Lieutenant Drucas responded by stating that he would call medical. (Id.) Wright states that a "nurse Hellen" (sic) then visited the block and checked on some of the inmates but not him and then "yelled out 'sign-up for sick call if you need help.'"[2] (Id.)

The only allegations against Correctional Officer Weisenberger relate to a brief interaction after the nurse left the block and are as follows:

14. Shortly afterwards, Defendant C/O

---

1.  (...continued)
life threatening situation, still had the mental capacity and foresight to ask to have photographs taken of the head of the frog.

2.  The nurse is not named as a defendant.

> Weisenberger came on the Pod and plaintiff told
> him the symptoms he was having and C/O
> Weisenberger refused to call medical.
> 15.  It was well known to Defendant C/O
> Weisenberger that the plaintiff was having
> a life threatening medical issue.
> 16. Defendant C/O Weisenberger failed to take
> action to help the plaintiff despite numerous
> requests for assistance from plaintiff.

(Id.) Wright admits that sick call requests were denied

on August 8 and 9, 2015, because medical staff did not

deem his "symptoms as being of an emergency medical

issue." (Id.)  Wright further admits that the symptoms

only lasted 48 hours before subsiding "except for the

vomiting which continues to happen when [he] eats food

that resembles the taste, texture or smell of the meal

that was served with the frog head in it." (Id.)

With respect to counselor "Ritchie," Wright

makes the following allegations:

> 23.  On 8-9-15 plaintiff submitted a request
> to staff, via DC-135A,[3] to his Counselor at the

--------

3.  Section 1, subsection A3, of the Inmate Grievance
System Procedures Manual of the Pennsylvania Department
of Corrections (DC-ADM 804) indicates that "[an] inmate
is encouraged to attempt resolution of a concern
informally by use of a DC-135A, Inmate Request of Staff
Member or direct conversation with the Unit Manager or
Officer-in-Charge prior to submitting a DC-804, Part 1,
Official Inmate Grievance Form[.]"

time, who was Ritchie, explaining his medical
emergency. []

24.  On 8-10-15 Defendant Counselor Ritchie
responded back to plaintiff via DC-135A
acknowledging plaintiff's medical emergency but
refusing to send medical aid.[4]

25.  It was well known to Defendant Counselor
Ritchie that the plaintiff was having a life
threatening medical issue.[5]

26. Defendant Counselor Ritchie failed to take
action to help the plaintiff despite request for
assistance from plaintiff.

(Id.) Wright goes on to allege that on August 10, 2015,
he submitted a grievance form DC-135A to Defendant
Luscavage in which he "explain[ed his] need for medical
attention;" on August 11, 2015, Defendant Luscavage
responded by acknowledging plaintiff's emergency medical
issues but refused to send medical aid; it was well
known to Defendant Luscavage that he had emergency
medical issues; and Defendant Luscavage failed to take

---

[4].  Exhibit K which Wright attached to his complaint
reveals, however, that "RHU Counselor Ritchie" told him
to "sign up for sick call." (Doc. 1-2, at 14.)

[5].  Considering that Wright admitted that his symptoms
subsided after 48 hours, this can only be characterized
as an extreme exaggeration.

action to help him despite numerous requests for assistance. (Id. at 7.)

In the DC-135A submitted to Defendant Luscavage which Wright attached to his complaint as an exhibit, Wright stated as follows:

> On 8-8-15 I ate a piece of a severed rotten reptilian head that was mixed into my supper meal tray. Pictures of this were taken by Lt. Drucas.  I have been denied medical treatment. My sick-call requests have not been answered. I have been denied psychological treatment. I am physically sick. I am mentally traumatized. I need you to provide a remedy for my issues with this incident.  I need a response to this request as soon as possible.

(Doc. 1-2, at 15.)  Defendant Luscavage responded to the grievance on August 11, 2015, by noting that Wright was seen by a physician assistant. Id.  Defendant Luscavage did not indicate or admit that Wright had "emergency medical issues." Id.

Wright alleges that on August 18, 2015, he submitted an informal grievance form DC-135A to Defendant Mooney explaining the incident of August 8, 2015. (Doc. 1, at 7.) Wright claims that Defendant Mooney knew he was having medical difficulties and refused to send medical aid. Id.  In the DC-135A, which

Wright submitted to Defendant Mooney and attached to his complaint, Wright repeated his allegations regarding the "reptilian head" and that he was physically sick and mentally traumatized. (Doc. 1-2, at 16.)  In responding to the grievance Defendant Mooney on the grievance form indicated that Wright's claim was being investigated and that his allegation that he had been denied medical attention was inaccurate.(Id.)

Exhibits attached to Wright's complaint reveal that Wright filed a formal grievance (number 581599) dated August 10, 2015, but received by the grievance coordinator, Captain Long, at SCI-Coal Township on August 12, 2015, relating to the August 8, 2015, incident.(Id. at 2-3.) In that formal grievance Wright asked for "$100,000,000.00 (one hundred million dollars and no cents) for [his] physical and mental anguish and trauma."(Id. at 3.) On September 1, 2015, Captain Long denied Wright's formal grievance. (Id. at 6.)  In so doing Captain Long stated in toto as follows:

> After review of all pertinent documents, conducting both staff and inmate interviews and reviewing proceedures (sic) for both meal and prep and distribution I find the following. There are 2 food service instructors present

while trays are being prepared for satalite (sic) feeding. The warmer cart is then locked in the staging area to await transport to the county housing units, medical or the RHU. Once delivered the cart is dropped in a secure area and then moved by RHU staff to an area where individual carts are prepared for feeding on the individual pods. The trays are then removed from the warmer and placed on serving carts, this is accomplished in a randomized manor. Lastly, the trays are delivered and the tray lid is removed by staff and visually inspected. During the interviews several of the inmates interviewed stated that there was a "rotten or odd smell" while several others stated there was no smell at all. Responding staff as well as reviewing food service staff report a foul odor noticeable from several feet away. And yet there was no smell when trays were prepared, transported, set up for distribution or opened for observation at the cell door for feeding; suggesting that the objects were placed on the tray after they were served.
With regard to claims that no medical assistance was provided, all inmates involved in the alleged incident were instructed to sign up for sick call by medical staff present on the POD. Lastly, this reviewer is in possession of information provided by a Confidential Source of Information which states that the "Frog Parts" were passed around to top tier inmates for the purpose of placing them in their trays. Furthermore this grievance is being considered frivolous as the events described were staged by you.

(Id. at 6.)

On September 6, 2015, Wright filed an appeal of the denial of the formal grievance to Defendant Mooney. (Id. at 7-8.) On September 30, 2015, Defendant Mooney

denied the appeal. (Id. at 9.) In so doing Defendant
Mooney stated in toto as follows:

> I have reviewed your appeal and initial review
> response by Captain Long.  This matter was
> thoroughly investigated and you should receive
> a misconduct for lying.  You are not the victim
> of alleged poisoning, you are a participant in
> a cruel prank in an attempt to gain monetary
> reward. The only "VICTIM" is the poor frog
> who was dismembered to serve your childish
> behavior.  All demands for compensation are
> vehemently denied.
> The Facility Manager upholds the initial review
> response.

(Id.)  Subsequently, Wright filed an appeal to the
Secretary's Office of Inmate Grievance Appeals,
Pennsylvania Department of Corrections, located in
Mechanicsburg, Pennsylvania. Id. at 10.  On October 27,
2015, Dorina Varner, the Chief Grievance Officer,
dismissed the appeal because Wright failed to provide
that office with the "required and/or legible
documentation for proper review." (Id.)

Wright requests declaratory and monetary relief.
With respect to monetary relief Plaintiff requests
compensatory damages in the amount of $125,000.00 and
punitive damages in the amount of $125,000.00. (Doc. 1,
at 10.)

Along with his complaint, Wright submitted a motion for leave to proceed _in forma pauperis_ under 28 U.S.C. § 1915. (Doc. 4.)

The Prison Litigation Reform Act (the "PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (April 26, 1996) imposed new obligations on prisoners who file suit in federal court and wish to proceed _in forma pauperis_ under 28 U.S.C. § 1915, _e.g._, the full filing fee ultimately must be paid (at least in a non-habeas suit). Also, a new section was added which relates to screening complaints in prisoner actions.[6]  For the reasons outlined below, Wright's complaint will be dismissed with leave to file an amended complaint.

---

6.  Section 1915(e)(2) provides:

> (2) Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that (A) the allegation of poverty is untrue; or (B) the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.

## Discussion

When considering a complaint accompanied by a motion to proceed <u>in forma pauperis</u>, a district court may rule that process should not be issued if the complaint is malicious, presents an indisputably meritless legal theory, or is predicated on clearly baseless factual contentions. <u>Neitzke v. Williams</u>, 490 U.S. 319, 327-28 (1989); <u>Wilson v. Rackmill</u>, 878 F.2d 772, 774 (3d Cir. 1989). Indisputably meritless legal theories are those "in which either it is readily apparent that the plaintiff's complaint lacks an arguable basis in law or that the defendants are clearly entitled to immunity from suit . . . ." <u>Roman v. Jeffes</u>, 904 F.2d 192, 194 (3d Cir. 1990) (quoting <u>Sultenfuss v. Snow</u>, 894 F.2d 1277, 1278 (11th Cir. 1990)). The Supreme Court has recognized that "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible . . . ." <u>Denton v. Hernandez</u>, 504 U.S. 25, 33 (1992); <u>see also</u> <u>Roman</u>, 904 F.2d at 194

(baseless factual contentions describe scenarios clearly removed from reality).  The Third Circuit added that "the plain meaning of 'frivolous' authorizes the dismissal of <u>in forma pauperis</u> claims that . . . are of little or no weight, value, or importance, not worthy of serious consideration, or trivial." <u>Deutsch v. United States</u>, 67 F.3d 1080, 1083 (3d Cir. 1995).  It also has been determined that "the frivolousness determination is a discretionary one," and trial courts "are in the best position" to determine when an indigent litigant's complaint is appropriate for summary dismissal. <u>Denton</u>, 504 U.S. at 33.

Even though a complaint is not frivolous it still may be dismissed under the screening provision of the PLRA if it fails to state a claim upon which relief may be granted.  Fed.R.Civ.P. 12(b)(6) is the basis for this type of dismissal.  Under Rule 12(b)(6), we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of

12

the complaint, the plaintiff may be entitled to relief."
<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d
Cir.2009) (quoting <u>Phillips v. County of Allegheny</u>, 515
F.3d 224, 231 (3d Cir.2008)).  While a complaint need
only contain "a short and plain statement of the claim,"
Fed.R.Civ.P. 8(a)(2), and detailed factual allegations
are not required, <u>Bell Atlantic Corp. v. Twombly</u>, 550
U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929
(2007), a complaint must plead "enough facts to state a
claim to relief that is plausible on its face."  <u>Id</u>. at
570, 550 U.S. 544, 127 S.Ct. 1955 at 1974, 167 L.Ed.2d
929.  "The plausibility standard is not akin to a
'probability requirement,' but it asks for more than a
sheer possibility that a defendant has acted
unlawfully."  <u>Ashcroft v. Iqbal</u>,___U.S.___, 129 S.Ct.
1937, 1949, 173 L.Ed.2d 868 (2009) (quoting <u>Twombly</u>, 550
U.S. at 556, 127 S.Ct. at 1965.) "[L]abels and
conclusions" are not enough, <u>Twombly</u>, 550 U.S. at 555,
127 S.Ct. at 1964-65, and a court "'is not bound to
accept as true a legal conclusion couched as a factual

allegation.'" Id., 127 S.Ct. at 1965 (quoted case omitted).

In resolving the issue of whether a complaint states a viable claim, we thus "conduct a two-part analysis." Fowler, supra, 578 F.3d at 210. First, we separate the factual elements from the legal elements and disregard the legal conclusions. Id. at 210-11. Second, we "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "'plausible claim for relief.'" Id. at 211 (quoted case omitted).

A plaintiff, in order to state a viable § 1983 claim, must plead two essential elements:  1) that the conduct complained of was committed by a person acting under color of state law, and 2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  Natale v. Camden County Corr. Facility, 318 F.3d 575, 580-581 (2003);  Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by

14

Strain v. Strackhouse, 920 F.2d 1135, 1141-42 (3d Cir. 1990).

Moreover, in addressing whether a viable claim has been stated against a defendant the court must assess whether Plaintiff has sufficiently alleged personal involvement of the defendant in the act which he claims violated his rights.  Liability may not be imposed under § 1983 on the traditional standards of respondeat superior.  Capone v. Marinelli, 868 F.2d 102, 106 (3d Cir. 1989) (citing Hampton v. Holmesburg Prison Officials, 546 F.2d 1017, 1082 (3d Cir. 1976)).  In Capone, the court noted "that supervisory personnel are only liable for the § 1983 violations of their subordinates if they knew of, participated in or acquiesced in such conduct."  868 F.2d at 106 n.7.

There are only two avenues for supervisory liability. First, as mentioned above if the supervisor knew of, participated in or acquiesced in the harmful conduct, and second, if a supervisor established and maintained a policy, custom or practice which directly

caused the constitutional harm. Id.; Santiago v. Warminster Township, 629 F.3d 121, 129 (3d Cir. 2010); A.M. ex rel. J.M.K. v. Luzerne County Juvenile Center, 372 F.3d 572, 586 (3d Cir. 2004).   However, with respect to the second avenue of liability conclusory, vague and speculative allegation of custom, policy or practice are insufficient under Twombly and Iqbal.  Id.

To establish an Eighth Amendment claim under § 1983, Wright must show that the prison official acted with "deliberate indifference" to a substantial risk of serious harm.  Farmer v. Brennan, 511 U.S. 825, 827 (1994) (citing Helling v. McKinney, 509 U.S. 25 (1993); Wilson v. Seiter, 501 U.S. 294 (1991); Estelle v. Gamble, 429 U.S. 97 (1976)).  In other words, the official must know of and disregard an excessive risk to inmate health or safety.  Natale v. Camden County Corr. Facility, 318 F.3d at 582; Farmer, 511 U.S. at  837. This standard "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients.  Courts will

'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment. . . which remains a question of sound professional judgment.'" Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (quoting Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).

Claims based upon the Cruel and Unusual Punishments Clause have both objective and subjective components. Wilson v. Seiter, 501 U.S. at 298. Serious hardship to the prisoner is required to satisfy the Eighth Amendment's objective component. Id. The subjective component is met if the person or persons causing the deprivation acted with "a sufficiently culpable state of mind". Id.

The objective component of an Eighth Amendment medical care claim, i.e., whether a plaintiff's medical needs were serious, has its roots in contemporary standards of decency. Hudson v. McMillian, 503 U.S. 1 (1992). A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or

is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1991); Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987); Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981); West v. Keve, 571 F.2d 158, 162-63 n.6 (3d Cir. 1978).  The serious medical need element contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain.  See Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d at 347; Archer v. Dutcher, 733 F.2d 14, 16-17 (2d Cir. 1984); Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977).

Assuming, without deciding, that Wright's medical need was serious in the constitutional sense, the allegations in the complaint and attachments thereto illustrate that Wright received some medical attention and it was decided that his condition was not of a serious or emergency nature.  Wright's disagreement with

18

the course of treatment or the decision that no treatment was necessary, however, does not serve as a predicate to liability under § 1983.  <u>See</u>, <u>White v. Napoleon</u>, 897 F.2d at 108-110(No deliberate indifference claim is stated when a doctor disagrees with the professional judgment of another doctor since "[t]here may, for example, be several acceptable ways to treat an illness."); <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d at 762(claim for deliberate indifference does not arise just because one doctor disagrees with the diagnosis of another).

Further, a complaint that a physician or a medical department was  "negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."  <u>Estelle</u>, 429 U.S. at 106.  More than two decade ago, the Third Circuit held that "[w]hile the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment

19

his behavior will not violate a prisoner's constitutional rights." <u>Brown v. Borough of Chambersburg</u>, 903 F.2d 274, 278 (3d Cir. 1990); <u>see also Spruill</u>, 372 F.3d at 235 ("Allegations of medical malpractice are not sufficient to establish a Constitutional violation.").

When an inmate is provided with medical care and the dispute is over the adequacy of that care, no Eighth Amendment claim exists. <u>White v. Napoleon</u>, 897 F.2d 103, 108-10 (3d Cir. 1990). "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice[.]" <u>Estelle</u>, 429 U.S. at 107. A mere difference of opinion between the inmate and the prison's medical staff regarding the diagnosis or treatment that the inmate receives does not support a claim of cruel and unusual punishment. See <u>McFadden v. Lehman</u>, 968 F. Supp. 1001 (M.D. Pa. 1997); <u>Young v. Quinlan</u>, 960 F.2d 351, 358 n.18 (3d Cir. 1992). Additionally, a non-physician defendant cannot be

considered deliberately indifferent for failing to respond to an inmate's medical complaints when the inmate is already receiving treatment from the prison's medical staff.  <u>See</u> <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 69 (3d Cir. 1993).  The key question is whether the defendant has provided the plaintiff with some type of treatment, despite whether it is what the plaintiff wants. <u>Farmer v. Carlson</u>, 685 F. Supp. 1335, 1339 (M.D. pa. 1988).

Wright fails to allege that Defendants Mooney, Luscavage, "Ritchie," and Weisenberger, non-medical defendants, were personally involved in any medical treatment decisions.  Rather, Wright premises their liability solely on the theory of respondeat superior. As discussed above, liability under § 1983 cannot be based on respondeat superior.  <u>Capone</u>, 868 F.2d at 106. Moreover, a claim of deliberate indifference to Wright's medical needs cannot lie against them, non-medical personnel, because Wright alleges that a nurse appeared on the cell block, assessed the situation and told the

inmates to sign up for sick call.  Durmer, 991 F.2d at 69.

Furthermore, with respect to Defendants Mooney, Luscavage and "Ritchie," the court discerns no allegations in the complaint that they were involved in any conduct which violated Wright's constitutional rights. There only involvement was with respect to the handling of Wright's grievances.  Such involvement is insufficient as a matter of law to render those defendants liable.  "[T]he failure of a prison official to act favorably on an inmate's grievance is not itself a constitutional violation." Rauso v. Vaughn, Civil No. 96-6977, 2000 WL 873285, at *16 (E.D.Pa., June 26, 2000). See also Overholt v. Unibase Data Entry, Inc., 221 F.3d 1335 (Table), 2000 WL 799760, at *3 (6th Cir.2000) ("The defendants were not obligated to 'properly' respond to Overholt's grievances because there is no inherent constitutional right to an effective prison grievance procedure. Hence, his allegations that the defendants did not properly respond

to his grievances simply do not rise to the level of a constitutional violation.") (citations omitted); Mitchell v. Keane, 974 F.Supp. 332, 343 (S.D.N.Y.1997) ("it appears from the submissions before the court that Mitchell filed grievances, had them referred to a prison official, and received a letter reporting that there was no evidence to substantiate his complaints. Mitchell's dissatisfaction with this response does not constitute a cause of action."); Caldwell v. Beard, Civil No. 2:07-CV-727, 2008 WL 2887810, at *4 (W.D.Pa. July 23, 2008) ("Such a premise for liability [i.e., for performing a role in the grievance process] fails as a matter of law."), aff'd,--- F. App'x ----, 2009 WL 1111545 (3d Cir. April 27, 2009); Caldwell v. Hall, Civil No. 97-8069, 2000 WL 343229, at *2 (E.D.Pa. March 31, 2000) ("The failure of a prison official to act favorably on an inmate's grievance is not itself a constitutional violation."); Orrs v. Comings, Civil No. 92-6442, 1993 WL 418361, at *2 (E.D.Pa. Oct.13, 1993) ("But an allegation that a defendant failed to act on a

grievance or complaint does not state a Section 1983 claim."); <u>Jefferson v. Wolfe</u>, Civil No. 04-44, 2006 WL 1947721, at *17 (W.D. Pa. July 11, 2006) ("These allegations [of denying grievances or grievance appeals] are insufficient to establish such Defendants' personal involvement in the challenged conduct under Section 1983. <u>See</u> <u>Watkins v. Horn</u>, 1997 WL 566080 at * 4 (E.D.Pa..[sic] 1997) (concurrence in an administrative appeal process is not sufficient to establish personal involvement)"). Consequently, Wright's claims against Mooney, Luscavage and "Ritchie," are not viable and the complaint as it relates to them will be dismissed.

Under even the most liberal construction, the complaint as it relates to all of the defendants fails to state a claim on which relief may be granted. There are no factual allegations, but merely conclusory allegations of wrongdoing.

For the reasons set forth above, the instant complaint will be dismissed, without prejudice, for failure to state a claim on which relief may be granted

pursuant 28 U.S.C. § 1915(e)(2)(B)(ii).  Although the
complaint as filed fails to state a cause of action
against the defendants, it is possible that the
deficiencies may be remedies by amendment.
Consequently, Wright will be granted such an
opportunity.  Wright is also advised that the amended
complaint must be complete in all respects.  It must be
a new pleading which stands by itself without reference
to the complaint already filed.  Such amended complaint
should set forth his claims in short, concise and plain
statements.  It should specify which actions are alleged
as to which defendants.  If Wright fails to file an
amended complaint adhering to the standards set forth
above, this case will be closed.

Also, pending before the court is a motion filed
by Wright for appointment of counsel. (Doc. 3).

Although prisoners have no constitutional or
statutory rights to appointment of counsel in a civil
case, a court does have broad discretionary power to
appoint counsel under 28 U.S.C. § 1915(d).  <u>Tabron v.</u>

25

Grace, 6 F.3d 147, 153, 155-57 (3d Cir. 1993) (setting forth non-exhaustive list of factors to be considered in ruling on motion for appointment of counsel, including the merits of the claims and the difficulty of the legal issues), cert. denied, 114 S.Ct. 1306 (1994); Ray v. Robinson, 640 F.2d 474, 477 (3d Cir. 1981).  The Court of Appeals for the Third Circuit has stated, however, that appointment of counsel for an indigent litigant should only be made "upon a showing of special circumstances indicating the likelihood of substantial prejudice to him resulting, for example, from his probable inability without such assistance to present the facts and legal issues to the court in a complex but arguably meritorious case."[7]  Smith-Bey v. Petsock, 741 F.2d 22, 26 (3d Cir. 1984).  But no part of the discussion in Smith-Bey of circumstances warranting appointment of counsel should be interpreted to mean that "appointment is permissible only in exceptional

---

7.  In light of the deficiencies of the complaint, this court cannot conclude that Wright has an arguably meritorious case.

circumstances and that, in the absence of such circumstances, the court has no discretion to appoint counsel." <u>Tabron</u>, 6 F.3d at 155.

Wright's motion fails to set forth sufficient special circumstances or factors warranting appointment of counsel. <u>See</u> <u>Tabron v. Grace</u>, <u>supra</u>. The court at this juncture cannot determine that Wright's claim have merit. In the pleadings submitted by Wright to date, he has demonstrated that he is capable of presenting his claims, although legally deficient. Furthermore, this court's liberal construction of <u>pro</u> <u>se</u> pleadings, <u>e.g.</u>, <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972), coupled with Wright's apparent ability to litigate this action <u>pro</u> <u>se</u>, mitigate against the appointment of counsel. Moreover, the legal and factual issues are relatively uncomplicated, and the court can not say, at least at this point, that Wright will suffer substantial prejudice if he is forced to prosecute this case on his own.

Therefore, Wright's motion for appointment of counsel will be denied.  In the event, however, that future proceedings demonstrate the need for counsel, the matter may be reconsidered either <u>sua</u> <u>sponte</u> or upon a motion properly filed by Plaintiff.

An appropriate order will be entered.


 s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge


Dated: April 25, 2016